UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

HECTOR RIVERA,

                       Defendant.

21 Civ. 8214 (PAE),
15 Cr. 722 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a *pro se* petition by defendant Hector Rivera under 28 U.S.C. § 2255. Dkt. 64 ("Pet.").[1]

I. **Background**

On November 17, 2017, following a six-day jury trial, Rivera was convicted of all three counts against him: (1) conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958 (Count One); (2) substantive murder for hire, in violation of 18 U.S.C. §§ 1958 and 2 (Count Two); and (3) a firearms offense connected to the murder-for-hire conspiracy. On May 2, 2018, the Court sentenced Rivera to mandatory life sentences on Counts One and Two, to be followed by a 25-year sentence on Count Three. Dkt. 59 ("Sentencing Tr.") at 24. Rivera, represented by new counsel, timely appealed on numerous grounds. On October 17, 2019, his conviction was affirmed in a summary order. *See United States v. Rivera*, 791 F. App'x 200, 211 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 333 (2020) (mem.).

---

[1] Rivera's petition is filed in both the underlying criminal case (15 Cr. 722) and a separate civil action under § 2255 (21 Civ. 8214). This decision will be posted to both dockets. Citations here are to the criminal case docket unless otherwise noted.

1

The underlying facts are set out in detail in the Second Circuit's summary order, *id.*, the Government's brief on appeal, and the Government's memorandum in opposition to the present § 2255 petition, Dkt. 68 ("Opp."). The following summary is limited to the facts necessary to address the issues raised in the petition.

The Government's prosecution of Rivera centered on the murder of Eduard Nektalov, a jeweler in Manhattan's Diamond District, who was shot dead on Sixth Avenue in Manhattan on the evening of May 20, 2004 at the start of his commute home. The Government adduced substantial and compelling evidence that Rivera orchestrated Nektalov's murder. The Government primarily relied on the testimony of two cooperating witnesses, Lixander Morales and Roni Amrussi, although this testimony was corroborated as to numerous vital particulars by independent evidence. As the Second Circuit summarized:

> According to the [cooperating witnesses'] testimony, Rivera started working as a "muscle man" for Amrussi, another diamond dealer in the District, in the 1990s. Although Rivera's services included providing Amrussi with protection, Amrussi was physically assaulted by Nektalov's associates in 2001, following a business dispute between the two men. The incident angered Rivera, and in 2004, he proposed to Amrussi that they "hurt Eddie Nektalov." Rivera suggested that the police would not suspect that they were behind an attack on Nektalov because Nektalov, who was facing criminal charges of money laundering at the time, had "many enemies" who were concerned that Nektalov was cooperating with law enforcement.
>
> Amrussi directed Rivera not to hurt Nektalov, but Rivera nevertheless asked Morales, an associate who had previously helped Rivera commit robberies, to find a hitman to kill Nektalov. Morales, in turn, traveled to Puerto Rico to recruit his friend, Carlos Fortier, for the job. Although he discovered on this trip that Fortier was actually living in New York, not Puerto Rico, Morales was able to obtain Fortier's phone and contact information from persons in Puerto Rico. Morales then returned to New York, located Fortier, and arranged a meeting between Rivera and Fortier. Later, at Rivera's direction, Morales took Fortier to Nektalov's jewelry store on 47th Street and showed him escape routes for possible use after the murder. Rivera also gave Morales a black Colt .45 to give to Fortier, instructing him to return the gun after "the job was finished."

> On May 20, 2004, Fortier shot and killed Nektalov with Rivera's gun. Shortly thereafter, Rivera met with Morales, paid him $20,000, and told him that he had also paid Fortier for the murder. Rivera then went to Amrussi, from whom he demanded $150,000 so that he (Rivera) could pay "[the] people who kill[ed] Eddie Nektalov." Amrussi complied, fearing that Rivera would otherwise harm him.

*Rivera*, 791 F. App'x at 203–04 (internal citations and footnotes omitted). Fortier was not tried for this offense, having died in prison months after his arrest for the murder.

In his unsuccessful appeal, Rivera principally raised five claims of error: that (1) the evidence against him was insufficient, *id.* at 204–05; (2) evidence of his prior criminal activity in consort with Amrussi and Morales was improperly admitted, *id.* at 205–06; (3) cross-examination of a detective about the adequacy of the police investigation into the Nektalov murder was improperly restricted, *id.* at 206–08; (4) it was error not to give a particular instruction on witness credibility, *id.* at 208–09; and (5) Rivera's right to be present at every stage of the trial, including sidebars, had been infringed, *id.* at 209–11.

## II. Discussion

In seeking to void his murder-for-hire and related convictions in his § 2255 petition, Rivera claims that his trial counsel—Mark S. DeMarco, Esq., and Karloff Commissiong, Esq.— were constitutionally ineffective, based on a variety of ostensible lapses.

To overturn his convictions based on ineffective assistance of counsel, Rivera must clear a high hurdle. Relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).[2] Claims of

---

[2] "In ruling on a motion under § 2255, the district court is required to hold a hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting 28 U.S.C.

3

ineffective assistance of counsel stem from the Sixth Amendment, which guarantees a defendant in criminal proceedings the right to "effective assistance from his attorney at all critical stages in the proceedings." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). A claim of ineffective assistance of counsel "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003). "In order to succeed on a claim of ineffective assistance of counsel, a claimant must meet the two-pronged test established by *Strickland* [*v. Washington*]." *Gonzalez*, 722 F.3d at 130. First, he must demonstrate that his "counsel's performance was deficient," and second, he must demonstrate that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The performance prong requires a showing that defense counsel's representation 'fell below an objective standard of reasonableness.'" *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 688). "As to prejudice, a defendant must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

Rivera's denunciation of his trial counsel's performance is highly unconvincing. Having presided over the case from the outset, the Court, in fact, was repeatedly impressed by counsel's dedication, vigor, and ingenuity. Prior to and during trial, counsel energetically litigated evidentiary and legal matters. Before the jury, counsel doggedly attacked the Government's case, including for its dependence on cooperator testimony that counsel persistently sought to establish was shaky and insufficiently corroborated.

---

§ 2255). Here, the Court finds that the parties' filings and the case record conclusively show that Rivera is not entitled to the relief sought and thus declines to hold a hearing.

As for the specific critiques in Rivera's § 2255 petition, substantially for the reasons the Government sets out in its opposition, which the Court incorporates by reference, all are wide of the mark. And, given the formidable evidence corroborating the cooperator testimony, which included damaging phone records tying Rivera to gunman Fortier the day of the murder, Rivera cannot demonstrate prejudice under the governing standards. Briefly:

***Pre-indictment delay***: Rivera's principal ground for claiming ineffectiveness is that counsel did not challenge, as a violation of due process, the timing of the Indictment, which was unsealed and filed in December 2016, more than 12 years after Nektalov's murder. Pet. at 4–12; *see* Dkt. 3. This argument fails, because Rivera does not articulate any coherent ground on which defense counsel could have pursued a viable claim of improper pretrial delay.

"[T]he statute of limitations is 'the primary guarantee against bringing overly stale criminal charges.'" *United States v. Cornielle*, 171 F.3d 748, 751 (2d Cir. 1999) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). "Accordingly, we have held that timely brought criminal prosecutions are only rarely dismissed." *Id.* at 752. "[I]n order to prevail on a claim of unconstitutional pre-indictment delay, a petitioner must show that he suffered actual prejudice as the result of the delay and that the delay was an intentional device to gain a tactical advantage." *Denis v. Upstate Corr. Facility*, 361 F.3d 759, 760 (2d Cir. 2004). "This is a stringent standard," *United States v. Maxwell*, 534 F. Supp. 3d 299, 316 (S.D.N.Y. 2021), and the defendant bears the "heavy burden" of proving both that he suffered actual prejudice and that the Government intentionally pursued the delay, *Cornielle*, 171 F.3d at 752 (quoting *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990)). In this context, prejudice means "that sort of deprivation that impairs a defendant's right to a fair trial" and "is commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness." *Id.* And to establish that the

Government's reasons for the delay were improper, the defendant bears the burden of establishing that the pre-indictment delay was "undertaken by the Government solely 'to gain tactical advantage over the accused,'" or "in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *United States v. Lovasco*, 431 U.S. 783, 795 & n.17 (1977) (quoting *Marion*, 404 U.S. at 324 and Government's brief).

The murder-for-hire and related charges against Rivera here were undisputedly filed within the limitations period. And Rivera does not identify any evidence that non-speculatively would have assisted his cause that was lost on account of the date the Indictment was returned. To the extent he points to the death of the hired gunman, Fortier died in prison shortly after his arrest in 2005, relatively soon after the Nektalov murder. Trial Tr. at 100. Rivera does not supply any basis to believe the Government's investigation had by that early date developed, let alone established convincing proof of, the links between Rivera and Fortier. On the contrary, the cooperation agreements with Amrussi and Morales, which centrally tied Rivera to the murder, were entered into years later.[3] Nor does Rivera explain why Fortier's testimony would have assisted him. Quite the contrary, the death of the killer deprived the Government of a potentially devastating inculpatory witness, a point Rivera himself celebrated with Amrussi and Morales upon learning of Fortier's death. *Id.* at 251–52, 523. Fortier might have testified to his hire by Rivera, or the content of a phone call, reflected in a phone record, that took place hours before the murder between Rivera's phone and the shelter in which Fortier had stayed the night before

---

[3] Amrussi testified at trial that he began meeting with the Government with the goal of obtaining a cooperation agreement shortly after his arrest in December 2008. *See, e.g.*, Trial Tr. at 255–56. Morales testified that he began cooperating with the Government after his arrest in 2009. *See id.* at 523–25.

6

the murder. To the extent Rivera imagines that phone, bank, or travel records might have exculpated him, his claim to this effect is undeveloped; he does not state what records he has in mind, how they would have exculpated him, or that a post-indictment attempt to secure these records had been made but proved unavailing. Finally, to the extent Rivera imagines that the detective originally assigned to the murder harbored evidence of an alternative perpetrator, *see* Pet. at 26, that detective remained available to be called at trial in 2017. As the Court observed at trial, defense counsel made a defensible strategic decision to forego that examination in favor of an argument that the Government had not met its burden. Trial Tr. at 831–40, 891–93.

Rivera also fails to explain coherently why the delay in seeking his indictment resulted from improper strategic motives. The trial proof suggested a benign explanation: that the timing of the charges followed from the often-protracted process by which other wrongdoers (such as Amrussi and Morales) are implicated in crimes and become cooperating witnesses as to other crimes and offenders. Rivera declares, without citing evidence, that the indictment "occurred in 2015 because of a follow-up review of the facts by a detective who had no association with the original investigation." Pet. at 4–5. Even if so, a fresh look at the proof, perhaps augmented by information from cooperating witnesses, would not, without more, be in any way improper.

Because the due process claim Rivera imagines would be meritless, his claim necessarily fails that his trial counsel were ineffective for failure to pursue it.

***Evidence of interstate travel***: Rivera next faults trial counsel for failing to challenge the sufficiency of the evidence of interstate travel. Pet. at 13–14. He declares that on the murder-for-hire counts, it was necessary for the "hired 'hit-man'" to have traveled interstate, and that the evidence did not show this. Pet. at 14. This argument, too, would have failed, and counsel were not ineffective for failing to make it.

In fact, as of the conduct at issue, the interstate element of 18 U.S.C. § 1958 was broader. The statute made it a crime to "travel[] in or cause[] another . . . to travel in interstate or foreign commerce, or use[] or cause[] another . . . to use . . . any facility in interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value," or to conspire to do so. 18 U.S.C. § 1958 (version effective October 11, 1996 to December 16, 2004). And the evidence at trial sufficiently established both that Rivera caused interstate travel and that he had used an interstate telephone network to further the murder-for-hire plot.

As to the former, Morales testified that he traveled, at Rivera's expense and direction, to Puerto Rico to recruit a gunman, Fortier, to carry out the Nektalov hit, although he discovered, once in Puerto Rico, that Fortier was already in New York. Trial Tr. at 496. As to the latter, the Government offered telephone records showing calls to Rivera's cell phone from a commercial telephone at the shelter where Fortier was staying; one of these calls occurred the morning of the murder, at around the same time that Fortier was documented leaving the shelter. GX 502, 405. The parties stipulated that Rivera's cell phone operated on a network capable of transmitting calls across state lines. Trial Tr. at 867–69.

Because a challenge to the sufficiency of the jurisdictional element would have been meritless, Rivera's claim necessarily fails that his trial counsel were ineffective for failing to pursue it.[4]

---

[4] On appeal, the Second Circuit rejected a different argument regarding the sufficiency of the evidence on the interstate commerce element. There, Rivera argued that Morales's travel to Puerto Rico did not satisfy the interstate commerce requirement because a murder-for-hire agreement was not yet in place between Rivera and Fortier. *Rivera*, 791 F. App'x at 205. The Circuit rejected that argument, noting that "section 1958(a) does not require that the interstate travel occur after defendants have finalized an agreement to carry out murder for hire," but "requires merely that a defendant act with the requisite *mens rea—i.e.*, 'with the intent that

8

*Cross-examination of the cooperating witnesses*: Rivera next faults his counsel's cross-examination of the two cooperating witnesses, broadly claiming that a fuller investigation would have resulted in more damaging examinations. *See* Pet. at 17–19, 25–26. Rivera, however, does not state what additional investigation should have done, or how it would have materially bolstered counsel's cross-examinations. In fact, counsel conducted lengthy and impactful examinations of both cooperating witnesses. As the Government summarizes, these drew out themes including the witnesses' cooperation agreements, their motives ostensibly to lie, their criminal histories, and Morales's prior inconsistent statements. *See* Opp. at 14 (citations to trial record omitted). These examinations were not ineffective, and Rivera's challenge to them as such is particularly off base given the principle that trial counsel's decisions as to cross-examination inherently are "strategic in nature and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (internal quotation marks omitted); *see also Love v. McCray*, 165 F. App'x 48, 49–50 (2d Cir. 2006).

*Jury charges as to Section 1958*: Rivera next faults his counsel for not arguing that the jury instructions given by the Court errantly described the elements of § 1958. Pet. at 20–21. The instructions to the jury, however, largely tracked the model jury instructions in Sand, *Modern Federal Jury Instructions*, and those given by other judges in this District, and Rivera does not identify any specific deficiency in them. In this critique, Rivera also reprises his claim, rejected on appeal, that the evidence was insufficient to establish these elements. To the extent

---

murder be committed [for hire]'—when he travels, or causes another individual to travel, across state lines." *Id.* (quoting former version of 18 U.S.C. § 1958). And, the Circuit noted, "the record supports a finding that Rivera caused Morales to travel to Puerto Rico for the illicit purpose." *Id.*

defense counsel failed to pursue these meritless arguments—and counsel did move for a judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the Government's case—such could not amount to ineffective assistance.

***Ex Post Facto claim***: Rivera next contends that his counsel failed to alert the Court to a fatal Ex Post Facto deficiency in the Indictment, which uses the term "facility *of* interstate or foreign commerce," whereas in fact, as of the date of the murder, the operative phrase in § 1958 was "facility *in* interstate or foreign commerce." Pet. at 21–22. The Second Circuit has held that these phrases are interchangeable. *United States v. Perez*, 414 F.3d 302, 304–05 (2d Cir. 2005) (per curiam). There was thus no harm to Rivera for the formulation of this phrase in the Indictment (or from the Court's instructions as to it). Trial and appellate counsel were not ineffective for failing to pursue this issue.

***Alternative theory of the murder***: Rivera next faults his trial counsel for not inquiring of a testifying officer, retired New York City Police Department detective Joseph Della Rocca, about information in an internal police memorandum indicating that an unidentified person had made a death threat to Nektalov. Pet. at 6–7. The Court precluded the questioning of Della Rocca, who had no knowledge of the memo or the incident, about the threat to Nektalov, while permitting defense counsel by other means to explore the adequacy of the police investigation. *See* Trial Tr. at 135–40, 142–43. Defense counsel elected not to, and set out their strategic reasons why in a sealed sidebar, the content of which the Court permitted to be held outside the presence of the Government. The Court found defense counsel's reasons, which focused on a strategic decision to focus on the shortcomings in the Government's case rather than attempting to take on the task of identifying an alternative suspect, sound. Defense counsel, the Court noted, reasonably was concerned that the jury might measure the Government's case as to the

10

murderer against the defense case, rather than against the governing standard of proof. *See* Trial Tr. at 891. Under *Strickland*, 466 U.S. at 690–91, this defensible strategic choice does not supply a basis for a finding ineffective assistance.

***Lesser included jury instruction***: Rivera, finally, argues that his counsel were ineffective for their failure to request a lesser included jury instruction under which the jury could have found him guilty as an accessory after the fact. Pet. at 24. That theory, however, was in conflict with the defense at trial, which Rivera does not renounce, under which he denied involvement in the murder. A categorical denial of responsibility has generally been held incompatible with an accessory-after-the-fact instruction. *Cf., e.g.*, *Waiters v. Lee*, No. 20-2190, 2021 WL 5183539, at *2 (2d Cir. Nov. 9, 2021); *Franza v. Stinson*, 58 F. Supp. 2d 124, 150 (S.D.N.Y. 1999). And Rivera does not identify facts in the trial record that would have supported such a finding. Defense counsel's decision not to pursue this futile course was well within the realm of defensible strategy and did not constitute ineffective assistance.[5]

***Lack of prejudice***: For the reasons above, Rivera cannot establish that his counsel's performance at trial, considered as a whole, fell below an objective standard of reasonableness. He therefore cannot establish prejudice from ineffective assistance. To the extent that Rivera's critiques fault counsel for their strategic decisions, he does not show—and the Court is wholly unpersuaded—that a different approach at trial would likely have yielded a different outcome.

---

[5] Rivera also faults his counsel for not pursuing, at sentencing, a downward departure based on his service in Vietnam. Pet. at 24–25. Defense counsel, however, developed—indeed, led with—the fact of Rivera's service in Vietnam and its effect on Rivera in the course of their sentencing submission, *see* Dkt. 54 at 1–2, and the presentence report also described this service, *see* Dkt. 51 ¶ 71. In any event, Counts One and Two carried a mandatory sentence of life imprisonment, precluding a downward departure; and had a life sentence not been mandated and the Court believed a lower sentence was warranted in light of factors including Rivera's military service, the sentencing mechanism of a downward variance—more flexible than that of a downward departure—would then have been available.

Counsel vigorously and effectively defended Rivera. In the end, the assembled evidence was varied, powerful, and compelling. The evidence, not any lapse by counsel, drove the outcome here.

The Court accordingly denies Rivera's motion for § 2255 relief.

The Clerk of Court is respectfully directed to terminate the motions pending at docket 1 in No. 21 Civ. 8214 and at docket 64 in No. 15 Cr. 722. These cases are to be or remain closed.

The Court also declines to issue a certificate of appealability and certifies that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: November 21, 2022
  New York, New York